

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-22-00464-CR

Derek Ryan **TAPIA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 454th Judicial District Court, Medina County, Texas
Trial Court No. 21-09-14170-CR
Honorable Daniel J. Kindred, Judge Presiding

Opinion by:    Beth Watkins, Justice

Sitting:       Irene Rios, Justice
               Beth Watkins, Justice
               Lori I. Valenzuela, Justice

Delivered and Filed: July 5, 2023

AFFIRMED

Appellant Derek Ryan Tapia appeals his aggravated assault conviction on sufficiency and

jury-charge error grounds. We affirm.

### BACKGROUND

Early in the morning on May 7, 2021, Araceli Alarcon ran into the Medina Regional

Hospital barefoot, and with blood on her face and a laceration on her head. She reported that she

had been assaulted by her boyfriend, Tapia. Corporal Christopher Lopez, Officer Maritza

Gonzalez, and Officer Jeffrey Simmons responded. Lopez and Gonzalez met with Alarcon, who

told the officers that Tapia had assaulted her with a hammer. Alarcon expressed concern for the safety of her two young children, who she reported were at the apartment with Tapia. The officers observed some injuries on Alarcon, including redness around her neck and chest area, swelling on her face, and a laceration on her head. The officers drove to the apartment to check on the children. According to Gonzalez and Simmons, when Tapia answered the door, he appeared "calm and collected." According to Lopez, Tapia appeared intoxicated. The officers checked on the children who were asleep and safe. The officers spotted an out-of-place rug and blood on both the door to the main bedroom and on crumpled-up paper towels, but no hammer.

The officers observed scratches on Tapia's neck and chest. Tapia explained that Alarcon had been drinking and that she was "upset" and went "crazy" because Tapia had received a text she thought was from another woman. Tapia attempted to leave but Alarcon blocked the door. She lunged at him and scratched him. Then, when she went outside to smoke a cigarette, he locked her out of the apartment. Tapia did not know where she went. When officers asked about the blood, Tapia said he was not sure where it came from. When they asked about the hammer, he responded that there was no hammer.

The officers did not arrest Tapia that night because they were unsure if he was the aggressor and they noted "holes" in Alarcon's account. They made sure Tapia and Alarcon were separated—they took Tapia to his grandmother's home and drove Alarcon back to the apartment. Gonzalez noticed Alarcon slurred her speech, stumbled when getting out of the police car, and that her own car was parked five to seven feet away from the curb.

When interviewed at the police department several days later, Alarcon denied she had been drinking that night. Her explanations of what happened "were very consistent and they actually filled in the holes" regarding the physical evidence at the apartment, so officers obtained a warrant

for Tapia's arrest. A grand jury indicted Tapia for aggravated assault with a deadly weapon. A jury found him guilty and assessed punishment at nine years and a $5,000 fine. Tapia appealed.

## ANALYSIS

In his first issue, Tapia argues that the evidence is insufficient because no rational trier of fact could have found that he struck Alarcon with a hammer.

### *Sufficiency*

### *Standard of Review*

We review a challenge to the sufficiency of the evidence under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013). Under that standard, we examine all the evidence in the light most favorable to the verdict and resolve all reasonable inferences from the evidence in the verdict's favor to determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Nowlin v. State*, 473 S.W.3d 312, 317 (Tex. Crim. App. 2015). "[N]o evidence is ignored because the standard requires a reviewing court to view all of the evidence in the light most favorable to the verdict." *Cary v. State*, 507 S.W.3d 750, 759 n.8 (Tex. Crim. App. 2016) (internal quotation marks and emphasis omitted). "An appellate court cannot act as a thirteenth juror and make its own assessment of the evidence." *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018). Rather, "[a] court's role on appeal is restricted to guarding against the rare occurrence when the factfinder does not act rationally." *Id*. This rationality requirement is a key and explicit component of the *Jackson* sufficiency standard. *See Jackson*, 443 U.S. at 319. The testimony of a single eyewitness, including the victim of an assault, can be sufficient to support a jury's verdict. *Aguilar v. State*, 468 S.W.2d 75, 77 (Tex. Crim. App. 1971) (bystander eyewitness); *Criff v. State*, 438 S.W.3d 134, 137–38 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) (victim eyewitness).

*Applicable Law*

A person commits an aggravated assault "if the person commits assault as defined in § 22.01 and the person . . . uses or exhibits a deadly weapon during the commission of the assault." TEX. PENAL CODE ANN. § 22.02(a)(2). A "deadly weapon" includes "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." TEX. PENAL CODE ANN. § 1.07(a)(17)(B). A hammer is not a deadly weapon per se, but it can be used as a deadly weapon. *Bethel v. State*, 842 S.W.2d 804, 807 (Tex. App.—Houston [1st Dist.] 1992, no pet.).

*Application*

The indictment alleged Tapia struck Alarcon with a hammer and that the hammer "in the manner of its use or intended use was capable of causing death or serious bodily injury[.]" Alarcon testified that on the night in question, she picked Tapia up from a friend's house, where he had been drinking, and brought him back to the apartment. She realized that Tapia was on drugs, "antsy," and not very "coherent." Alarcon recorded Tapia to show him the next morning that "like this is what drugs do to you, you know. I wanted him to see how he was." Tapia walked around holding his chest, looking confused, and talked about wanting to go to the hospital. He asked for water. Tapia said he had taken cocaine. Alarcon testified that she told Tapia that she was going to leave him. Tapia became frustrated with her and started pushing her.

Alarcon said that he soon placed her in a choke hold, pushed her face down into the floor, and punched her in the back of the head. She hit him back. He then picked up a hammer from the table and came towards her swinging it as if to scare her. He was also kicking her. He grabbed the rug out from underneath her and threw it on her head and then retreated to the main bedroom, where their baby was asleep. She yelled at him to leave and threatened to call the police. As she was standing at the threshold to the room, he rushed at her; she turned quickly and then just

- 4 -

remembers "seeing black." Then, she was on her knees and "there was a whole bunch of blood." Tapia was standing behind her holding the hammer.

Alarcon told the jury she did not see Tapia hit her with the hammer, but she felt it. She asked him to take her to the hospital because she was dizzy and bleeding. She promised to not "say anything" but in response he gave her some paper towels and told her, "Bitch, clean yourself up." When he started washing his hands, she took the opportunity to leave, and she just ran. She "ended up running towards the hospital." When she arrived, she told personnel she was bleeding from her head. Her head laceration was closed with staples.

The jury heard and saw other evidence corroborating Alarcon's testimony: photographs of her injuries; the physical evidence at the apartment; officer testimony that Alarcon's account of the assault matched up with that physical evidence; and officer testimony that the injury to Alarcon's head was "serious" and "consistent with a strike of the head of a hammer." The jury also saw the video Alarcon had recorded of Tapia. Although Tapia's version of events conflicted with Alarcon's version, the jury, as the sole trier of fact, was entitled to selectively believe all or part of the conflicting testimony introduced by either side at trial. *See Bignall v. State*, 887 S.W.2d 21, 24 (Tex. Crim. App. 1994). Viewing the evidence in the light most favorable to the jury's verdict and bearing in mind the reasonable inferences that the jury was free to make from that evidence, we conclude that the evidence is legally sufficient to support the jury's determination that Tapia's use or intended use of a hammer constituted a deadly weapon because it could cause death or serious bodily injury. *See id.*; *Aguilar*, 468 S.W.2d at 77; *Bethel*, 842 S.W.2d at 808; *Criff*, 438 S.W.3d at 137–38. We overrule Tapia's first issue.

***Jury Instruction***

Tapia argues that the trial court error in submitting an instruction to the jury during punishment phase of trial that defendant's good conduct time could expedite his eligibility for parole caused egregious harm.

*Applicable Law*

To be reversible, any unpreserved jury-charge error must result in egregious harm. *Olivas v. State*, 202 S.W.3d 137, 144 (Tex. Crim. App. 2006). "Jury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016). "Under *Almanza*, reviewing courts should consider the following four factors: 1) the charge itself; 2) the state of the evidence including contested issues and the weight of the probative evidence; 3) arguments of counsel; and 4) any other relevant information revealed by the record of the trial as a whole." *Olivas*, 202 S.W.3d at 144.

*Application*

The trial court erroneously charged the jury that if it sentenced Tapia to a term of imprisonment, he would "not become eligible for parole until the actual time served plus any good conduct time earned equals one-half of the sentence imposed." The State concedes on appeal that inclusion of the "plus any good conduct time earned" language was error because Tapia's judgment contains a deadly weapon finding. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07 § 4(a); *Hooper v. State*, 255 S.W.3d 262, 268 (Tex. App.—Waco 2008, pet. ref'd). As a result, if sentenced to imprisonment, Tapia would "not be eligible for release on parole until [his] actual calendar time served, without consideration of good conduct time, equals one-half of the sentence[.]" *See* TEX. GOV'T CODE § 508.145(d)(2).

We disagree with Tapia's contention that this jury-charge error caused "egregious harm." First, the trial court's "instruction contained the standard curative language admonishing the jury not to consider the extent to which" good-conduct time may be awarded or forfeited by Tapia or how parole law might apply to Tapia himself. *See Igo v. State*, 210 S.W.3d 645, 647 (Tex. Crim. App. 2006); *Luquis v. State*, 72 S.W.3d 355, 360, 366 (Tex. Crim. App. 2002) (overall purpose of curative instruction is to inform jury of concepts of parole and good-conduct time but prohibit jury from using its notions of parole and good-conduct time "in any calculus in assessing the appropriate punishment").

Second, the focus at punishment was whether Tapia was a good candidate for probation. *Olivas*, 202 S.W.3d at 144.

Third, the closing arguments focused on probation—neither parole nor good conduct time was mentioned by either counsel during argument on punishment. *See Igo*, 210 S.W.3d at 647. Defense counsel argued, "However much probation you think is appropriate, that's what I'm asking for." The prosecution countered, "don't even consider probation. It's not right. Prison is the right sentence. And my submission to you is 15 years[.]"

Fourth, the jury did not send any notes to the trial court regarding parole or good conduct time or their effect on Tapia's length of incarceration, and nothing in the record indicates "the jury failed to heed the trial court's admonition against considering how" either might affect Tapia's term of actual imprisonment. *See Murrieta v. State*, 578 S.W.3d 552, 556 (Tex. App.—Texarkana 2019, no pet.).

Under these circumstances, we do not find egregious harm. *See Igo*, 210 S.W.3d at 647–48. We overrule Tapia's second issue.

## CONCLUSION

Having overruled Tapia's complaints on appeal, we affirm the judgment of the trial court.


Beth Watkins, Justice

DO NOT PUBLISH